J-A14018-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.P., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: Z.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 505 EDA 2026 |

Appeal from the Order Entered February 6, 2026
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000195-2025

BEFORE:  STABILE, J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED JUNE 30, 2026**

Z.P. (Father) appeals from the juvenile court's February 6, 2026, order finding that aggravated circumstances exist pursuant to Section 6381(d) of the Child Protective Services Law (CPSL),[1] with respect to Z.P. (Child) (born in July 2022).  Child is Father's biological son with Z.G. (Mother) (Mother and Father collectively referred to as "Parents").  The juvenile court found aggravated circumstances existed based upon an incident that occurred on February 21, 2025, wherein Child had ingested amino clonazepam and benzoylecgonine, requiring emergency medical treatment and hospitalization.

_____

[1] 23 Pa.C.S.A. § 6381(d).

Child ingested the drugs while in the care of T.P. (Paternal Grandmother).[2] After careful consideration, we affirm.

At the February 6, 2026, dependency/aggravated circumstances hearing, Department of Human Services of Philadelphia County (DHS) presented evidence that on February 21, 2025, Parents brought Child to the emergency room at the University of Pennsylvania's Methodist Hospital (hospital). N.T., 2/6/26, at 9. Amanda Deutsch, M.D. (Dr. Deutsch), who treated Child in the emergency room, recalled

> [F]ather coming in, … holding [Child] and reporting that [Child] had gotten into some kind of substance[. T]hey weren't certain what [Child] had taken.
>
> And I remember that [Child] looked well[,] all things considered at that time, and we put him on monitors and we talked about that we were going to work him up for … whatever known substance [he] could have gotten into.

*Id.* at 10. Dr. Deutsch explained that, according to her notes, someone at the residence

> found [Child] in the kitchen, and was concerned about him not acting normally.
>
> And it seems from further clarification that Father had not been at home[,] but Child had been with grandparents or a grandparent watching [the children] at the time. And … they were pretty concerned that [Child] had gotten into something and had not been acting normally at home.

_____

[2] Father and Mother claimed they left Child and Child's four-year-old sister (Sibling) with Paternal Grandmother, while Parents ran an errand.

*Id.* at 11 (capitalization modified). Neither Father nor Mother could identify the substance Child had ingested. *Id.* at 12. However, Mother brought an empty, unlabeled medication bottle to the emergency room. *Id.*

Upon examining Child, Dr. Deutsch found that Child

was responding well and appropriately, but he had a little bit of dilated pupils, more than I would expect, and had a little bit of trouble keeping his trunk or his core solid for the age that he was. It seemed like [Child] was unable [to sit up]….

*Id.* at 12-13. Dr. Deutsch explained that these symptoms

indicate[d] that something was probably ingested or wrong[.] [I]t's not [a] clear indicator of one disease or symptom of one particular thing. Dilated eyes could be multiple different drugs or neurologic problems that could be occurring because it's a neurologic symptom. And the unstable core to me just made me wary that something's going on[.] [T]his isn't just a normal … two-and-a-half[-]year[-]old in front of me.

*Id.* at 13. Dr. Deutsch ordered chest and abdomen x-rays, urine drug screens, and blood tests. *Id.* at 15. Dr. Deutsch

talked with Poison Control, and had concerns that [Child] would need to be observed longer, and under specialized pediatric care[. Dr. Deutsch] started the conversations to talk to [Children's Hospital of Philadelphia (CHOP)] as a transfer option [for Child] ….

*Id.* at 16.

Dr. Deutsch testified that she was called back to the emergency room because "my nurses were getting concerned that [Child] wasn't behaving the

- 3 -

same way[.]" *Id.* Dr. Deutsch explained that Child's Glasgow Coma Scale

(GCS)[3] measured at a "3," and this was concerning:

> [W]hat this means is [that Child's] eyes are no longer opening to
> verbal response. He wasn't opening his eyes to [] painful stimuli
> that we were trying to do to see if he was responding
> appropriately. And again, motor and verbal [were] no longer just
> voluntarily doing things, [and Child] wasn't responding.
>
> [Child's] vitals also started to change, the heart rate had
> decreased but wasn't at a level that I had to start CPR yet, but
> those are the things I was beginning to think about, how do I have
> to intervene, am I going to be coding a child soon, and the blood
> pressure had started to decrease.

*Id.* at 17-18.

After consulting with the poison control center, Dr. Deutsch treated Child

with Narcan. *Id.* at 18. However, Narcan did not provide

> as quick of a response as I was hoping for[.] … [I]t could mean
> that it wasn't just opioids or anything that we were thinking about,
> but [Child] did have a response eventually to Narcan[. T]he heart
> rate and blood pressure responded, and [Child] started opening
> his eyes again, and responding and acting appropriately[,] which
> was relieving to know that we weren't going to have to all of a
> sudden intubate, … or perform CPR because things were going in
> the right trend again.
>
> ….
>
> We gave [Child] fluids to help with [his] blood pressure, that was
> low. I ended up giving [Child] steroids because one lip looked like
> it was swelling, I didn't know what we were dealing with, so I
> wanted to make sure we weren't just dealing with an allergic
> response to anything that had been occurring.

---

[3] According to Dr. Deutsch, the GCS provides a measurement of how a patient's eyes and body respond to stimuli. N.T., 2/6/26, at 17. A normal GCS would be a "15." *Id.*

*Id.* at 18-19. According to Dr. Deutsch, Child was in the emergency room for two hours, after which he was transferred to CHOP. *Id.* at 19.

Dr. Deutsch testified that Child tested positive for amino clonazepam and benzoylecgonine. *Id.* at 28. Dr. Deutsch explained that amino clonazepam is a metabolite of benzodiazepines, which is a class of anti-anxiety medication. *Id.* at 29. Dr. Deutsch further stated that benzoylecgonine is a metabolite of cocaine. *Id.* at 30. According to Dr. Deutsch, Child's response to the administration of Narcan "indicate[d] that it wasn't an opioid that I was dealing with[.] … [T]his could be suggestive of the medications that were found in the drug screen." *Id.* at 32.

Marquita Waites (Ms. Waites), a DHS social worker, testified that in February 2025, she received a Child Protective Services report regarding Father and Mother. *Id.* at 34. Ms. Waites investigated a reported "serious physical neglect of" Child. *Id.* at 41. As part of her investigation, Ms. Waites visited the "home of origin" in which Mother, Father, Paternal Grandmother and Child's paternal grandfather (Paternal Grandfather)[4] reside. *Id.* at 34, 53. At the home, Ms. Waites spoke with, *inter alia*, Paternal Grandmother and Paternal Grandfather. *Id.*

---

[4] There appeared to be confusion as to whether a paternal uncle lived at the home. Later testimony stated that it was Paternal Grandfather, not paternal uncle, who lived at the home.

Ms. Waites spoke with Mother on the day of the incident. *Id.* at 43. Mother told Ms. Waites that she and Father were not home at the time Child ingested the drugs. *Id.* at 43-44. Mother stated that she left Child in the care of Paternal Grandmother. *Id.* at 43. Mother informed Ms. Waites that at around 3:56 p.m., Mother received a call from Paternal Grandmother indicating that "something was wrong" with Child. *Id.* at 44. At that time, Paternal Grandmother told Mother to "come home." *Id.* at 45.

Mother did not indicate to Ms. Waites that anyone called 9-1-1 at that time. *Id.* Mother did not know the type of substance(s) Child had ingested. *Id.* Mother told Ms. Waites that upon entering the home, she and Father immediately took Child to the hospital. *Id.* at 47. Ms. Waites testified that she received conflicting information regarding the incident involving Child. *Id.* at 52-53. Paternal Grandmother told Ms. Waites that she was supervising Child at the time of the incident, and did <u>not</u> call 9-1-1. *Id.* at 55.

On the day of the incident, Ms. Waites requested that Mother get drug screening, but Mother failed to comply. *Id.* at 56. Although Mother said she was unable to obtain a drug screen, Ms. Waites testified that she gave Mother "several places [Mother] could have went without paying for it." *Id.* at 57. Ms. Waites further informed Mother that drug screening could be performed at the emergency room at that time. *Id.*

Mother eventually obtained drug screening. *Id.* at 58. Ms. Waites did not know the results of the drug screen. *Id.* However, Ms. Waites indicated

that Paternal Grandfather and Paternal Grandmother tested negative for narcotics. *Id.*

While inside of the home, Ms. Waites did not observe any medications "left out[,] but I did take pictures of the [Paternal Grandfather's] medication and [Paternal Grandmother's] medication." *Id.* at 46. Paternal Grandfather's medications were stored in his bedroom, and Paternal Grandfather indicated that Child does not go into his bedroom. *Id.*

**Ms. Waites testified that Father declined to speak with her during the investigation**. *Id.* at 47.

Ms. Waites testified that on February 24, 2025, Parents were placed under a "safety plan," at which time Parents were told to ensure that the children are appropriately supervised, and that "they abide by the plan[.]" *Id.* at 43. According to Ms. Waites, Amira Johnson (Ms. Johnson) initially served as the safety provider. *Id.* at 60-61.

Inas Kanan (Ms. Kanan), the Community Umbrella Agency case manager, testified that her duties were to

> manage this case, to do home assessments, to do home visits, make sure that these children are safe, make sure they're up to date on medical, dental, make sure that they are enrolled in school, make sure if they need any behavioral health services, early intervention, and then to assist parents with referring them to [Achieving Reunification Center (ARC) for] services, behavioral health, domestic violence, [as well as Family Tree Consulting (FTC)] meetings, every six months, that's pretty much it.

*Id.* at 64-65. Ms. Kanan testified that at the time she became involved with the family, Mother and Father lived in the same household.[5] *Id.* at 67.

Father deferred to Mother's attorney regarding the presentation of witnesses. *Id.* at 81. Mother presented the testimony of Paternal Grandmother. Paternal Grandmother testified, through an interpreter, that on February 21, 2025, she provided care for Child and Sibling at Paternal Grandmother's home. *Id.* at 85. Paternal Grandmother had cared for the children on previous occasions. *Id.* at 85-86. On February 21, 2025, Mother dropped the children off at Paternal Grandmother's home, so that Mother could go to the welfare office. *Id.* at 86. Paternal Grandmother stated that she kept the children "in [] one room for them to play." *Id.* Paternal Grandmother testified as follows regarding the children's actions within her home:

> Q. [Mother's counsel:] … What were the children doing during that time?
>
> A. [Paternal Grandmother:] They just like [*sic*] back and forth, back and forth.
>
> Q. Where were you doing the time that you were supervising them?
>
> A. I'm also in the house.
>
> Q. … [I]s your house one floor or is it more than one floor?

---

[5] After the incident, the children were placed with maternal grandmother. However, when maternal grandmother indicated she could no longer care for the children, they were placed in foster care.

A. It's two story, first and second floor.

Q. So … where were they playing?

A. In the room on the second floor.

Q. Did they ever leave that room?

A. Yes, they would go downstairs.

Q. They were able to go up and down the steps at that time?

A. Yes.

Q. And so at some point they went downstairs?

A. Yes, correct.

Q. And about how long were they downstairs?

A. I didn't pay attention, I don't know.

*Id.* at 87.

Paternal Grandmother testified that Sibling came "to get me [to] tell me [to] please come downstairs, [Child] just took a pill." *Id.* at 88. Paternal Grandmother acknowledged that she takes prescription medications, but did not "think there was any medication downstair[s.] … [T]here was none, I don't know how they got it." *Id.* at 89.

On cross-examination, Paternal Grandmother acknowledged that she sometimes has the assistance of a home care provider. *Id.* at 92. Further, when asked whether "the family" resided together in Paternal Grandmother's home in February 2025, Paternal Grandmother stated, "Yes." *Id.* When asked to clarify this response, Paternal Grandmother testified that Mother lives "in

northeast [Philadelphia]. She came and dropped kids off for me to look after." *Id.* at 93.

Mother testified at the hearing. Mother explained that Paternal Grandmother often cared for the children, and "as I was taking them back and forth to daycare, … the kids resided with her often[.]" *Id.* at 98. Mother acknowledged that she also serves as Paternal Grandmother's home health care aide. *Id.* Nevertheless, Mother expressed no concerns about leaving the children in Paternal Grandmother's care on the day of the incident. *Id.* at 98-99.

Mother testified that around 3:00 p.m. on February 21, 2025, Paternal Grandmother called Mother's phone and indicated that "she didn't really know what was going on with [Child]." *Id.* at 99. Mother stated that Paternal Grandmother

> was kind of in shock to everything. She called me instantly[,] me and [Father]. [We r]ushed from the welfare office. I didn't even get what I had to get done at the welfare office done. We rushed instantly back home.

*Id.* at 99-100. According to Mother, Paternal Grandmother "said she tried to call for … the ambulance to come[,] but no one []ever showed up but me and [Father]." *Id.* at 100. Mother testified that upon arriving at Paternal Grandmother's home, Father immediately "grabbed [Child] and instantly rushed to the car, [and] got [Child] into the car." *Id.* Mother stated that neither parent inquired as to what had happened, as they "saw how our baby

- 10 -

was looking …." *Id.* At the hospital, Mother learned Child had ingested something. *Id.* at 102.

Prior to leaving Child at Paternal Grandmother's house, Mother never observed any medication lying about the home. *Id.* at 103. According to Mother, Paternal Grandmother and Paternal Grandfather "keep all their prescription medications in their room in one spot[. I]t never moves unless they're taking their medication." *Id.* at 113.

Mother testified that she is employed by Century Home Care, and provides home care to Paternal Grandmother. *Id.* at 115. Mother explained that

> I clean her home, sometimes I bathe her if she's waking up with achy pains and stuff, I'll help her bathe, some stuff like that[.] [S]he really doesn't need help taking her medication so I don't bother her medication. I care [*sic*] to all her needs that she needs done. I cook for her.

*Id.* at 115-16. Mother testified that Paternal Grandmother was able to care for the children. *Id.* Mother also testified that Child's Paternal Grandfather, who lives in the same home, is immobile; "he can't barely move at all." *Id.*

Mother denied that either she or Father used cocaine or benzodiazepine. *Id.* at 123. Mother also denied that Paternal Grandmother used cocaine or benzodiazepine. *Id.* Mother denied telling the DHS investigator that she and Father were living at Paternal Grandmother's residence at the time of the incident. *Id.* at 123-24.

Mother also presented the testimony of Ms. Johnson. *Id.* at 128-29. Ms. Johnson testified regarding events that took place subsequent to February 21, 2025. *Id.* at 130-31.

**Father did not testify at the hearing.**

The juvenile court found Child to be dependent, and relevant to this appeal, found that aggravated circumstances exist as to Father and Mother. Juvenile Court Order, 2/6/26. Father timely filed the instant appeal.[6] Father and the juvenile court have complied with Pa.R.A.P. 1925.

Father presents the following issue for our review:

Whether the [juvenile] court erred in determining the evidence to have been sufficient to sustain the finding of "child abuse" with regards to [Father] pursuant to the aggravated circumstances order.

Father's Brief at 5.

Father argues that the juvenile court's aggravated circumstances order is not supported by sufficient evidence. *Id.* at 11. Father claims that he was not the person who had arranged to leave the children with Paternal Grandmother. *Id.* at 13. Father asserts that "there had been no evidence whatsoever with regard to the pills in question, as to whom they had belonged[]; nor, where the pill bottle had been kept[.]" *Id.* According to Father, Ms. Waites "at no point had sought to inquire as to any [drug] use."

_____

[6] It is unclear from the record whether Mother filed an appeal of the dependency or aggravated circumstances orders.

*Id.* Father contends that even if he had been made aware of "certain risky circumstances, which [Father] would assert to be purely speculative; it is still averred to have been insufficient in establishing the necessary degree of recklessness." *Id.*

Our standard of review requires that we "accept the findings of fact and credibility determinations of the [juvenile] court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *In re L.V.*, 127 A.3d 831, 834 (Pa. Super. 2015). Thus, we review the juvenile court's finding of aggravated circumstances for an abuse of discretion. *See id.*

Here, the juvenile court found that Father perpetrated Child's abuse pursuant to 23 Pa.C.S.A. § 6381(d), because Child suffered serious bodily harm that occurred at a time when Father was responsible for Child's welfare, and Father provided no explanation of how these injuries occurred. N.T., 2/6/26, at 161-62.

As this Court has explained,

[although] dependency proceedings are governed by the Juvenile Act [], 42 Pa.C.S.A. §§ 6301-6375, … the CPSL[, 23 Pa.C.S.A. § 6301-6387,] … controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence. The CPSL does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse and bringing quickly into play those services (including court hearings) available through county protective service facilities for the care of the child. [T]he [Juvenile] Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL, and] reference must be made to the definition sections of

- 13 -

both the law and the [CPSL] to determine how that finding [of child abuse] is interrelated.

*In the Interest of C.B.*, 264 A.3d 761, 770 (Pa. Super. 2021) (*en banc*)

(footnotes, quotation marks, and some citations omitted).

As our Supreme Court has explained,

the requisite standard of proof for a finding of child abuse pursuant to Section 6303(b.1) of the CPSL is clear and convincing evidence. [A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S.[A.] § 6341(c)[]. Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." [] However, in certain situations, the identity of the abuser need only be established through *prima facie* evidence….

*In the Interest of N.B.-A.*, 224 A.3d 661, 668 (Pa. 2020) (some internal

citations, quotation marks, and emphasis omitted).  *Accord C.B.*, 264 A.3d

at 770-71.  Section 6381(d) provides for an attenuated standard for making

a legal determination as to the abuser in child abuse cases:

**(d) *Prima facie* evidence of abuse. --** Evidence that a child has suffered serious physical injury, … or serious physical neglect of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d).  Thus, under these circumstances, "the fact of abuse

suffices to establish *prima facie* evidence of abuse by the parent or person

responsible."  *C.B.*, 264 A.3d at 771 (citation omitted).

> *Prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines whom the abuser would be in a given case. There is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the Act to establish child abuse. **The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that** *prima facie* **evidence the custodian has caused the injury, either by acts or omissions, is all that is required**….

*Id.* (emphasis in original) (citation omitted).

Instantly, Father's reference to "recklessness" is not relevant where, as here, the statutory presumption arises.

> [E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse *unless the parent or responsible person rebuts the presumption*. The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person *about whom they had no reason to fear* or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the [juvenile] court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

*In the Interest of L.Z.*, 111 A.3d 1164, 1185 (Pa. 2015) (emphasis added; footnote omitted). Thus, Father could rebut Section 6381's presumption only by demonstrating either (1) the injuries were accidental and medically plausible; or (2) the child was in the care of a responsible adult about whom Father had no reason to fear, **coupled with a credible explanation that accounted for the injuries**. *Id.*; *see also Interest of G.R.*, 282 A.3d 376,

- 15 -

382-84 (Pa. Super. 2022) (holding that a parent must present competent, substantive evidence or testimony to rebut the Section 6381(d) presumption).

In explaining the applicability of Section 6381(d)'s presumption when parents are not physically present at the time of a child's injury, our Supreme Court stated the following:

> First, to the extent that the courts have required a parent's physical presence during the injury based upon the phrase "responsible for the child," we reject the application of this phrase to "parents." Instead, we observe that the phrase modifies the immediately preceding term, "other person," understandably limiting the class of other persons who can be held presumptively accountable for any injuries suffered by a child. Conversely, parents are always responsible for their children, absent extenuating circumstances, such that it would be repetitive to apply the limiting phrase to parents.
>
> Additionally, we note that the plain language of the statute neither mentions nor focuses upon the parent or responsible person's physical presence at the time of the injury, but rather extends to both acts and omissions of the parent or responsible person. **The inclusion of "omissions" encompasses situations where the parent or responsible person is not present at the time of the injury but is nonetheless responsible due to his or her failure to provide protection for the child.**

*L.Z.*, 111 A.3d at 1184 (emphasis added).

Instantly, the juvenile court stated its rationale for finding aggravated circumstances:

> [W]e do not know the source of the drugs that this two-and-a-half-year-old toddler took. What we do know is that he ingested benzos [*sic*] and cocaine. He suffered serious bodily harm, and thankfully, it was not a fatality.
>
> The testimony reflects that [M]other and [F]ather left the child with [] Paternal Grandmother. … [Mother] took the empty [p]ill

bottle to the hospital that was unlabeled, who knows if that was the source or somewhere else was the source.

What we do know is that this two and a half year old did not purchase drugs; that this two year old is not on drugs; and again, thankfully[,] his ingestion of these drugs did not end in a fatality.

[The juvenile court finds] that [DHS] did meet the burden for …a finding of child abuse under [Section] 6381[(d),] and aggravated circumstances….

N.T., 2/6/26, at 162 (punctuation modified). The juvenile court's findings are supported by the record, and its decision conforms to the applicable law.

Applying Section 6381(d) as set forth above to the case at bar, our review of the record confirms that Father failed to rebut Section 6381(d)'s presumption. The record is uncontradicted that Father left two-year-old Child and Child's four-year-old Sibling in the sole care of Paternal Grandmother, who sometimes needed the assistance of a home aide. Paternal Grandfather, who is totally incapacitated, also lived in the home. The evidence conflicted as to whether Mother and Father also lived at the home with Paternal Grandmother. However, Paternal Grandmother and Paternal Grandfather tested negative for the type of drugs ingested by Child, leaving no explanation for how those drugs were accessible to Child. Father did not testify at the hearing, and his counsel deferred to Mother's counsel for the presentation of rebuttal evidence. N.T., 2/6/26, at 81. **Father offered no alternative explanation for Child's injuries.**

Thus, Father failed to demonstrate either (1) the injuries were accidental and medically plausible; or (2) Child was in the care of a responsible adult,

**about whom Father had no reason to fear**, **coupled with a credible explanation that accounted for Child's injuries**. *See L.Z.* 111 A.3d at 1185. Under these circumstances, we discern no basis upon which to reverse the juvenile court's finding of aggravated circumstances pursuant to Section 6381(d). Father's issue merits no relief.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/30/2026